RECORD NO. 12-4683

IN THE

# United States Court of Appeals

## FOR THE FOURTH CIRCUIT

_____

UNITED STATES OF AMERICA,

*Plaintiff-Appellee,*

v.

ANES SUBASIC,
a/k/a Mladen Subasic,

*Defendant-Appellant.*

_____

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
AT RALEIGH

_____

**OPENING BRIEF OF APPELLANT
ANES SUBASIC**

_____

Eric A. Bach
ATTORNEY AT LAW
P. O. Box 33566
Charlotte, North Carolina 28233
(704) 364-6580 Telephone
ebach@mindspring.com

*Counsel for Appellant*

October 15, 2013

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................ ii

STATEMENT OF SUBJECT MATTER AND APPELLATE
JURISDICTION ........................................................................................1

STATEMENT OF ISSUES ...........................................................................2

STATEMENT OF THE CASE.......................................................................3

STATEMENT OF FACTS .............................................................................4

SUMMARY OF ARGUMENT .....................................................................9

ARGUMENT ................................................................................................10

**I.** THE TRIAL COMMITTED REVERSIBLE ERROR IN ALLOWING
THE INTRODUCTION OF FOREIGN CRIMINAL RECORDS WHERE
AN IMPROPER FOUNDATION WAS LAID AND IN ABSENTIA
CONVICTIONS WERE USED ...............................................................10


**II.** THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN
FAILING TO EXCLUDE THE GOVERNMENT'S EXPERT WITNESS
TO TESTIFY AS AN EXPERT WITNESS IN THE FIELD ISLAMIC
EXTREMISM AS THE GOVERNMENT FAILED TO MAKE A PRIMA
FACIE CASE AS REQUIRED BY THE DAUBERT CASE....................14

CONCLUSION ............................................................................................17

CERTIFICATE OF COMPLIANCE............................................................18

CERTIFICATE OF FILING AND SERVICE .............................................19

ADDENDUM ...............................................................................................20

# TABLE OF AUTHORITIES

**CASES**

Belk v. Meyer,  679 F.3d 146, 162 (4th Cir. 2012) .......................................... 15

Crosby v. United States, 506 U.S. 255, 258 (1993). ...................................... 12

Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579, 592 (1993) . 9, 14, 15

Kumho Tire v. Carmichael, 526 U.S. 137, 148 (1999) .................................. 15

United States v. Foster, 429 F.3d 73, 79 (4th Cir. 2012)........................... 10, 14

United States v. Kirzhnev, 682 F.3d 51 (1st Cir. 2012). ................................ 11

United States v. Koziy, 728 F.2d 1314 (11th Cir. 1984) ................................ 11

United States v. Lawrence, 161 F.3d 250 (4th Cir. 1990) .............................. 12

United States v. Mohamud, 3:10CR475-KI, (2013 U.S. Dist. Lexis 1239) (January 4, 2013) ........................................................................................ 16

United States v. Squillacote, 221 F.3d 542, 563 (4th Cir. 2000)..................... 11

**STATUTES**

18 U.S.C. § 956............................................................................................... 1

18 U.S.C. § 1425 (2013) ............................................................................... 1, 4

18 U.S.C. § 2339(A)(b) ................................................................................. 1, 4

18 U.S.C. § 3742,........................................................................................... 1

21 U.S.C. 841, 846 (2010) ............................................................................. 1

28 U.S.C. § 1291 (2010) ................................................................................. 1

**OTHER AUTHORITIES**

U.S. Dept. of State Foreign Affairs V.III § 8914.3 (2001)............................ 12

**RULES**

Fed. R.  Evid. 902 (3)(2012). ....................................................................... 9, 10

Fed. R. Evid. 403 (2012). .......................................................................... 12, 13

Rules Three and Four of the Rules of Appellate Procedure ............................. 1

## STATEMENT OF SUBJECT MATTER AND APPELLATE

## JURISDICTION

This appeal arises from the defendant's two jury trials and sentencing hearing. The United District Court for the Eastern District of North Carolina, New Bern Division had jurisdiction pursuant to 18 U.S.C. § 2339A(b), 18 U.SC. § 956, 18 U.S.C. § 1425 (2013); 28 U.S.C. § 1291 (2010). The Fourth Circuit Court of Appeals has jurisdiction pursuant to 18 U.S.C. § 3742, and Rules Three and Four of the Rules of Appellate Procedure. 18 U.S.C. §3742 (2012); FRAP R. 3,4 (2012). Notice of appeal was filed in the District Court August 24, 2012 (JA 154).

## STATEMENT OF ISSUES

1. **Did the trial court err in allowing the government to introduce foreign documents without laying a sufficient foundation on the records and not calling a proper person to lay the foundation?**

2. **Did the trial court err in allowing the government to introduce convictions where the trial occurred without the Defendant being present?**

3. **Did the trial court err in allowing the government to call an expert witness on terrorism where there was no factual basis or methodology to support the expert's theory?**

## STATEMENT OF CASE

The Defendant was charged in a thirteen count bill of superseding indictment filed in the Eastern District of North Carolina on November 24, 2010 (JA 105).  The Defendant entered a plea of not guilty.  The Defendant proceeded to trial on the immigration charges before Judge Malcolm Howard.  The jury found him guilty of both counts Twelve and Thirteen (JA 1102).

The parties held on pretrial Daubert hearing on regarding the testimony of expert witness, Evan Kohlman.  The court issued an order partially denying the  Defendants' motions.  The Defendant proceeded to trial on the terrorism charges on May 11, 2012 before Judge Flanagan.  The jury returned a verdict of guilty to Counts One and Two (JA 1301).

Judge Flanagan presided over the Defendant's sentencing hearing on August 24, 2012.  At sentencing,  Judge Flanagan sentenced the Defendant 180 months on Count 1ss, 360 months on Count 2ss, 120 months on Count 13ss, all terms be served concurrently (JA 1495).  The Defendant entered notice of appeal on August 24, 2012 (JA 1502 &JA 55-77).

## STATEMENT OF FACTS

The original indictment in this case was filed on July 22, 2009 in the Eastern District of NC.   The government filed a superseding on November 24, 2010 (JA 105).   The government alleged that the Defendant violated counts: one, two, twelve, and thirteen.   Count One alleged a conspiracy to fund terrorist groups pursuant to 18 U.S. C. § 2339A.   Count Two alleged conspiracy to murder, kidnap, maim, and injure persons pursuant to 18 U.S.C. § 956(a).   Count Twelve alleged procuring naturalized citizenship by providing false information pursuant to 18 U.S.C. § 1425(a).   Count Thirteen alleged providing false immigration on From N-400 in violation of § 1425(a).

The Defendant proceeded to trial on the immigration charges during the week of September 19, 2011.   Judge Malcolm Howard presided over the Defendant's trial on the immigration charges contained in Counts Twelve and Thirteen.

During the immigration trial the government introduced evidence alleging that the Defendant was convicted in Serbia of serious criminal offenses while living in Serbia in the 1990s.   The government alleged that Defendant failed to answer truthfully on immigration forms N-400 and I-590 when he applied for naturalization on December 2, 2003 and for Refugee

Status in I-590 in 1999 (JA 901-925).

The government introduced the majority of this evidence through Mr. Rajic an employee of the FBI since 2009 in Sarajevo, Bosnia Herzegovina. Special Agent Colvin of the FBI directed Mr. Rajic to gather documents relevant to Mr. Subasic (JA 426-542).

During his testimony, Mr. Rajic claimed that the obtained Mr. Subasic's criminal record from the Ministry of Internal Affairs.   Mr. Rajic also claimed that he obtained Mr. Subasic's record of conviction from the Ministry of Affairs.   The only verification was a stamp placed on the documents.  No one from the Department of Internal Affairs appeared in court and no affidavit was prepared (Tp. 383-388).

Mr. Rajic also claimed that he obtained documents from the court in Banjo Lala.  Mr. Rajic alleged that the documents had been certified as exact copies.  These documents were introduced as United States' exhibits 20 to 25 and 28 (JA 394-398).

On questioning from the court, Mr. Rajjic stated that the convictions covered from 91 to 95, specifically 93-94 and later (JA 400-04).   The Defendant objected to the introduction of these documents.   The court

allowed these documents to be introduced over the objection of the Defendant (JA 400). The court admitted these documents as foreign documents (JA 415). The court ruled the documents were admissible under the Vidacak case (JA 415-16). The documents presented were not the original. A large number of the documents were faxed to the U.S. Embassy in Sarajevo (JA 436-38). These convictions included convictions that occurred in the absence of the Defendant (JA 1062, Exhibit 34A). The government alleged that the Defendant placed false information on two specific immigration forms:N400 and N652. On Immigration Form N400 the government alleged that the Defendant falsely answered questions 16 and 17 (JA 354, 509). Subasic answered no to the question concerning whether he had been arrested and whether he had been charged with an offense.

## Daubert Issue

On August 16, 2011, Judge Louise Flanagan presided over the hearing. During the Daubert hearing, Mr. Evan Kohlman testified at the hearing. While testifying about his credentials, Mr. Kohlman stated that he testified over seventeen times for the prosecution in terrorism cases (JA 170). Mr. Kohlman did not demonstrate any specific degrees that he had in the terrorism field. He stated that a large portion of his knowledge was based on viewing

radical Islamic websites and social media websites (JA 171-73). He listed

four factors that he looked like in evaluating whether an individual had

become a radicalized Muslim. The five factors that he listed:

1. Self Selecting Scheme

2. Presence of training materials.

3. Endorsement of radical sectarian ideology

4. The Presence of en masse propaganda

5. The Presence of en masse propaganda (JA 179-180).

During the outline of his testimony and expert's report he referenced several

Al Qaeda afflicated terrorists that had received substantial coverage including

al-Alwlaki (JA 183). As part of his review of documents, the expert assumed

all of the information contained in the fifty-three FBI 302s was true, including

statement by non law enforcement. (JA 261). This included hearsay

statements attributed to non law enforcement witnesses.

The expert's opinion also included the mental state of the Defendants.

Mr. Kohlman concluded there was high probability that the Defendants were

violent extremists and part of a home grown terror network (JA 198 and 261).

## Trial Testimony

During his trial testimony, the expert witness' testimony predominantly centered around summarizing the teachings of various extremist leaders throughout the entire Middle Eastern - North African regions. The witness highlighted several Al Qaeda based terrroists. These included Osama Bin Laden, Dr. Ayman al-Zawahiri, Al Awlaki, Sheik ayl Andel. Each of these individuals possessed extreme beliefs. However, there was no testimony specifically linking these individuals to Bosnian-Serbian Terrorist Groups. The only tie was some of evidence was taken from the computers that the government seized while executing search warrants. However, not all of this evidence could be tied to the evidence collected by the government.

# SUMMARY OF ARGUMENT

## Issue One

During the Defendant's immigration trial, the trial committed reversible error in allowing the introduction of foreign convictions and charging documents without a sufficient foundation. The government did not call anyone from the local Sarejevo government or court system. The one person called was a FBI employee, but he did not hold one of the necessary positions under Federal Rule of Evidence 902. It was also an error to introduce convictions were the Defendant was not present during the trial.

## Issue Two

The district court committed reversible error in allowing the government's expert witness, Evan Kohlman to testify. Under the Daubert line of cases, there is no sound methodology to support his theory on Islamic terrorism.

## ARGUMENT

**I.    THE TRIAL COMMITTED REVERSIBLE ERROR IN ALLOWING THE INTRODUCTION OF FOREIGN CRIMINAL RECORDS WHERE AN IMPROPER FOUNDATION WAS LAID AND IN ABSENTIA CONVICTIONS WERE USED.**

### Standard of review

The trial court reviews evidentiary issues under the abuse of discretion standard.   The court's evidence rulings are reviewed under the abuse of discretion of standard. United States v. Foster, 429 F.3d 73, 79 (4th Cir. 2012).

\* \* \*

During the Defendant's immigration trial the court committed reversible error in admitting the foreign documents without proper authentication.  These documents included convictions where the conviction occurred after an in absentia trial of the Defendant. Foreign documents are governed by Rule 902 of the Federal Rules of evidence.  Fed. R.  Evid. 902 (3)(2012).

Rule 902(3) states:

> A document that purports to be signed or attested by a person who is authorized by a foreign country to do so. The document must be accompanied by a final

certification that certifies the genuineness of the signature and official petition of the signer or attester- or of any foreign official whose certificate of genuineness relates to the signature or attestation or is in a chain of certificates of genuineness relating in the signature or attestation. The certification may be made by the secretary of a United States embassy or legation; by a counsel general, vice consul, or consular agent of the United States….

Case law also clarifies that there are two primary requirements under this particular rule of evidence. First, there must be some assurance of what the documents asserts to be. Second, the person testifying to authenticity of the documents must hold a proper position of authority under the rule. United States v. Squillacote, 221 F.3d 542, 563 (4th Cir. 2000), cert. denied, 532 U.S. 971 (2001) (citing United States v. Koziy, 728 F.2d 1314 (11th Cir. 1984)). A document showing a conviction must be signed or authenticated by one authorized to do. Second there must final certification documenting the authenticity of the signer of the documents. United States v. Kirzhnev, 682 F.3d 51 (1st Cir. 2012), .

In the present case, the documents did have a stamp on the documents. However, there was no accompanying affidavit. Furthermore, many of the documents were faxed documents, and it appeared they were not picked up

directly from the records custodian (JA 924-928 & 957-965).

Furthermore, Mr. Rajic appears not to hold a position listed in the particular rule of evidence.  He stated that he had worked for the FBI in Serbia.  However, he does not hold the position of Secretary to U.S. embassy, Consul General, Vice Consul or Consular Agent.  <u>See</u>, U.S. Dept. of State Foreign Affairs V.III § 8914.3 (2001).  Therefore, it appears that these documents were not properly authenticated.

In addition to the issue of authentication, the trial court allowed the government to introduce at least one conviction where the government conducted an *in absentia* during the trial (Exhibit 34A, JA 1062).  Case law clarifies that holding such a trial where the Defendant did not flee during the trial or at its commencement is a constitutional violation.  <u>See</u>, <u>United States v. Lawrence</u>, 161 F.3d 250 (4th Cir. 1998), <u>cert. denied</u>, 526 U.S. 1031 (1999); <u>Crosby v. United States</u>, 506 U.S. 255, 258 (1993).  Counsel is unaware of a case exactly on point in the Fourth Circuit.  However, counsel contends that due to the unconstitutional nature of these convictions were not admissible under Rule 403 of the Federal Rules of Evidence.  Fed. R. Evid. 403 (2012). These convictions have extremely limited probative value that was substantially outweighed by its prejudicial affect.

In summary, the district court committed reversible error in admitting the evidence related to the foreign convictions obtained in Sarajevo. These documents were not authenticated by a proper person. Furthermore, the introduction of convictions obtained in absentia of the Defendant was reversible error as such evidence was precluded by Rule 403 of the Federal Rules of Evidence.

**II.    THE TRIAL COURT COMMITTED REVERSIBLE ERROR IN FAILING TO EXCLUDE THE GOVERNMENT'S EXPERT WITNESS TO TESTIFY AS AN EXPERT WITNESS IN THE FIELD ISLAMIC EXTREMISM AS THE GOVERNMENT FAILED TO MAKE A PRIMA FACIE CASE AS REQUIRED BY THE DAUBERT CASE.**

### Standard of review

The court's evidence rulings are reviewed under the abuse of discretion of standard.   United States v. Foster, 429 F.3d 73, 79 (4th Cir. 2012).

The trial court committed reversible error in allowing Evan Kohlman to testify as an expert witness in the Defendant's trial.  The Defendant filed a pro se motion on this issue (JA 132).  The court conducted a hearing on this issue on August 16, 2011.  Judge Flanagan allowed the testimony of Mr. Kohlman while expressing some limited reservations on this issue of mental state. Judge Flanagan filed an order related to this hearing on September 16, 2011 (JA 291).  During the Defendant's terrorism trial, Mr. Kohlman testified at the Defendant's trial during the court's May 11, 2012 term.

In the Daubert case, the Supreme Court explained the scope of Federal Rule of Evidence 702.  The Court explained that although an expert witness has wide latitude in the scope of his testimony, the district court must act as a gatekeeper and determine that there exists sound methodology to back the

expert's opinion.  Daubert v. Merrell Dow Pharmaceuticals, 509 U.S. 579,

592 (1993); Kumho Tire v. Carmichael, 526 U.S. 137, 148 (1999);  see also,

Belk v. Meyer,  679 F.3d 146, 162 (4th Cir. 2012) (Following Kumho Tire).

In the present case, there is no sound foundation for the Defendant's

testimony.  The Defendant does not have any special training in this field of

terrorism.  Instead, his knowledge is based upon a series of overseas contact,

reading websites, reading social media, and reading newspaper articles on

global terrorism.  The allegations in the current case concerned a group of

individuals with ties to the Bosnia-Serbia region.  However, he demonstrated

no special knowledge of the Bosnia-Serbia region.  In fact, his testimony at

trial appeared to be a mixture of all Islamic extremist.  He made no distinction

from Pakistan extremist, North African extremists, and Egyptian extremists.

Furthermore, he had five part test for extremism.  However, there was

no evidence that there was any peer reviewed acceptance of his theory.  There

is also evidence that his five part test is often a six part test.  There is also no

evidence that he has been granted any personal contact with any of these

extremist similar to the contact that FBI profilers have had with their subjects.

Furthermore, courts that have encountered Mr. Kohlman have

expressed concerns about the scope of his testimony.  For example, Judge

King of the U.S. District Court for the Oregon District has expressed concern about Mr. Kohlman's theories. Although he allowed him to testify, Judge King expressed concerned about the fact Mr. Kohlman tailored his theory of factors to each specific trial. Sometimes he used six factors, but in other cases it was less than six factors. He also had no statistical analysis to support his theory. Finally, Judge King questioned Mr. Kohlman's claim that he could render a fact based opinion of the motivation of the particular Defendant. See, United States v. Mohamud, 3:10CR475-KI, (2013 U.S. Dist. Lexis 1239) (January 4, 2013).

In summary, the court committed reversible error in allowing Mr. Kohlman to testify in the Defendant's trial. There was not an adequate foundation to support the expert's theory. Under the Daubert line of cases, there is no methodology that supports the expert's theory. Furthermore, the majority of his knowledge could be introduced through magazine and newspaper articles. These articles provide the same facts without the speculative theories. Therefore, the Defendant should be granted a new trial.

## CONCLUSION

The district court erred in allowing the expert witness to testify on the terror issue and allowing the introduction of foreign documents without a proper foundation.  Therefore, the Defendant should have his case remanded for a new trial.

This the 15th day of October 2013

_____/s/ Eric A. Bach_____

Eric A. Bach
Attorney for the Defendant
P.O. Box 33566
Charlotte NC 28233
704-364-6580
e-mail ebach@mindspring.com
NC Bar no. 19794

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 32(a)(7)(B)(ii) of the Federal Rules of Appellate Procedure and Local Rule of Federal Appellate Procedure 32(b), I hereby certify that this brief contains 2,683 words, excluding the parts of the brief exempted by Rule 32(a)(7)(B)(iii) and has been prepared in Microsoft Word, Times New Roman, 14 point, a proportionally spaced font.

October 15, 2013

_____/s/ Eric A. Bach_____

Eric A. Bach
Attorney for the Defendant

## CERTIFICATE OF SERVICE

I hereby certify on October 15, 2013 that the required number of copies of the Appellant's Brief has been filed with the Fourth Circuit Court of Appeals a copy of the Defendant's Brief has been duly served upon the U.S. Attorney by using the 4th Cir. ECF System:

**Jennifer May Parker(Jennifer.may-parker@usdoj.gov)**

**Raleigh NC 27601**

October 15, 2013

_____/s/ Eric A. Bach_____

Eric A. Bach
Attorney for the Defendant

**ADDENDUM**

**UNCLASSIFIED (U)**

U.S. Department of State Foreign Affairs Manual Volume 3
Personnel

# 3 FAM 8900
# CONSULAR AGENT HUMAN RESOURCES ADMINISTRATION

## 3 FAM 8910
## GENERAL

*(CT:PER-696;  06-10-2013)*
*(Effective Date:  04-08-2001)*
*(Office of Origin:  HR/OE)*

## 3 FAM 8911  APPOINTMENT AUTHORITIES

*(TL:PER-404;  05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

a. Section 303 of the Foreign Service Act of 1980 (the Act) (22 U.S.C. 3943) provides general authority for the Secretary of State (the Secretary) to appoint certain members of the Foreign Service, including consular agents, under such regulations as the Secretary may prescribe.

b. New consular agents are appointed as intermittent employees for an initial temporary appointment that may not exceed one year under section 309 of the Act (22 U.S.C. 3949) and the regulations contained in this subchapter. Service as an acting consular agent or temporary consular agent may be counted towards the initial one-year limitation. Subsequent limited appointments (i.e., extensions) as intermittent employees may be made upon expiration of the initial temporary appointment in any amount of time that is not in excess of three years although a three-year extension will be typical.

c. Section 309 of the Act provides that limited appointments for consular agents may be extended so that cumulative service may exceed five years. The consular agent appointment authority is retained in the Department under the procedures of this regulation and has not been delegated to post.

d. Consular agents (including acting and temporary consular agents) are appointed by the Secretary to assist the post having territorial jurisdiction (the supervisory post) in the performance of limited consular services, which are defined and authorized by certain international agreements (primarily The Vienna Convention on Consular Relations), statutes and regulations.  (See sections 72.1(b), 72.17 and 92.4(e) of Title 22 of the Code of Federal

**UNCLASSIFIED (U)**

Regulations.)

e. Consular agents work under the direct supervision of the principal consular officer at the supervisory post. In countries that have a countrywide consular coordinator, such officer may provide countrywide policy management and procedural guidance.

f. Consular agents are not transferable and are appointed for specific duties at specific locations.

g. Consular agents, including citizens of the United States and noncitizens, are members of the Foreign Service as defined under section 103(7) of the Act (22 U.S.C. 3903).

# 3 FAM 8912  APPOINTMENT OF CONSULAR AGENTS

## 3 FAM 8912.1  Request for Recommendation

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

When it is determined that a consular agent is to be appointed for a specific purpose at a specific place, the appropriate regional bureau executive director requests the supervisory post, with the concurrence of the supervisory consular officer in a country where such an officer is present, to recommend a suitable candidate for the position (see 2 FAM 422.1-4). Individuals are designated as acting consular agents until all the requirements for designation as a full consular agent are met.  See 3 FAM 8912.4.

## 3 FAM 8912.2  Standards for Employment and Ethics Requirements

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

The following standards shall be applied by supervisory posts in making recommendations to the Department for appointment of consular agents:

(1) A properly qualified U.S. citizen is preferred for appointment over a noncitizen. If a properly qualified U.S. citizen is not available for appointment, the post may recommend a properly qualified noncitizen for the position;

(2) The person recommended for the position of consular agent must be of good reputation in the community, capable and reliable, with a clear

concept of the nature of the work for which the consular agent will be responsible. The supervisory post should review the candidate's other business, affiliations, and interests, and ensure that the candidate would not benefit as a result of his or her service as a consular agent, as well as determine whether such service could create any appearance of conflict of interest;

(3) A person already employed in any other capacity by the United States, or who holds an office under a foreign government or any other public office, may not be appointed as consular agent while so employed. A Foreign Service national employee may not be employed concurrently as a consular agent; and

(4) The person selected must receive the new entrant ethics orientation as provided in 5 CFR 2638.703(a)(3).

# 3 FAM 8912.3  Forms Required

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

When recommending a candidate for appointment as consular agent, the supervisory post submits the following forms to the appropriate regional bureau executive director:

(1) Form OF-612, Optional Application for Federal Employment (3 copies);

(2) Form SF-85P, (Questionnaire for Public Trust Positions—3 copies, and Form SF-85P-S, Supplemental Questionnaire for Selected Positions for Moderate Risk Public Trust Certification—3 copies);

(3) Form FD-258, FBI Fingerprint Card (2 copies)—(with DOS in ORI Block);

(4) Form DS-1143, Request for Security Clearance (to be completed by the regional bureau executive office upon receipt of the security and employment forms from post);

(5) Verification of birth (copy of passport data page or birth certificate);

(6) Consumer Credit Release (available from DS/ICI/PSS);

(7) Form DSP-80, Statement Regarding Actions on Behalf of Foreign Principals (3 copies);

(8) Form SF-144, Statement of Prior Federal Service;

(9) Form SF-181, Race and National Origin Identification; and

(10) Form SF-256, Self Identification of Reportable Handicap.

# 3 FAM 8912.4  Acting Appointments Pending

**UNCLASSIFIED (U)**
U.S. Department of State Foreign Affairs Manual Volume 3
Personnel

# Completion of Security Processing

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

When the supervisory post has complied with the requirements of 3 FAM 8912.2 and 3 FAM 8912.3, the appropriate regional bureau, with the concurrence of the Bureau of Consular Affairs, may authorize an appointment as acting consular agent by initiating and approving a personnel action, pending a conversion to a full consular agent appointment.  The appropriate regional bureau, at its option, may require the supervisory post to draft and submit the Form SF-52 electronically.  At that point, the acting consular agent may enter on duty as set forth in section 3 FAM 8912.7.  Upon notification by the Bureau of Diplomatic Security that appropriate security and suitability processing have been favorably completed, the regional bureau may advise the supervisory post that the appointee may be converted to a consular agent in accordance with 3 FAM 8912.6.

# 3 FAM 8912.5  Approval, Commission, and Exequatur

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

a. After the approval of the recommendation for appointment and the satisfactory completion of the necessary security and suitability investigation, the appropriate regional bureau will initiate a second Form SF-52, Request for Personnel Action, to convert the acting consular agent to a full consular agent appointment. The appropriate regional bureau, at its option, may require the supervisory post to draft and submit the Form SF-52 electronically.  The Department will transmit Form SF-50, Notification of Personnel Action, to the supervisory post and the consular agent's assignment commission to the embassy.

b. After receipt of the commission, the embassy's chief of mission applies for an exequatur or comparable Government document, which, upon receipt, is forwarded with the commission to the consular agent through the supervisory post.

c. Once the acting consular agent has been converted to a full consular agent appointment, the supervisory post may annotate (passport endorsement code 15) the regular, fee-paid passport of a U.S. citizen agent to read: "The bearer is a Consular Agent of the United States in (location)."

**UNCLASSIFIED (U)**
U.S. Department of State Foreign Affairs Manual Volume 3
Personnel

# 3 FAM 8912.6  Effective Dates of Employment, Termination and Length of Appointments

## 3 FAM 8912.6-1 Employment

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

Upon notification of approval from the Department and notice of the provisional recognition of the consular agent's accreditation, the post should notify the acting consular agent that duties may be assumed as a full consular agent but not on or prior to one of the following dates, as applicable:

(1)  If the consular agency is being established upon the closure of a consulate, the closing date of that consulate; or

(2)  If the incoming agent is taking over the duties from another consular agent or acting consular agent, the date of relinquishment of duties by the agent on duty.  See 2 FAM 422.1-4.

## 3 FAM 8912.6-2  Termination

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

The period of official duty of a consular agent terminates at the close of business on one of the following dates, as applicable:

(1)  The closing date of the consular agency or the date the agent is relieved of duties by the supervisory post, whichever is sooner; or

(2)  The date the agent relinquishes duties to another consular agent or acting consular agent; or

(3)  Upon expiration or termination of a temporary or limited appointment that is not extended.

## 3 FAM 8912.6-3  Length of Appointments

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

All consular agent appointments are limited Foreign Service appointments.  The initial limited appointment is a temporary appointment that may be made for a period up to but not in excess of one year. One-year initial limited appointments will be typical.  Service as an acting consular agent or temporary consular agent may be counted towards the initial one-year limitation.  At the request of the

supervisory consular post, and with the approval of the Executive Director of the appropriate regional bureau and the Bureau of Consular Affairs, the initial temporary appointment may be extended by a limited appointment for any period of up to three years.  A three-year extension will be typical.  Thereafter, additional extensions of limited appointments may be made for any periods of up to three years each. Again, three-year extensions are typical.  The appropriate regional bureau will initiate a Form SF-52 for each extension.  The appropriate regional bureau, at its option, may require the supervisory post to draft and submit the Form SF-52 electronically.  There is no statutory or regulatory limit on the number of limited appointment extensions.

## 3 FAM 8912.7 Forms Executed Upon Entry on Duty

*(TL:PER-404;  05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

a. Immediately upon entry on duty, the acting consular agent must execute the Form SF-61, Appointment Affidavit, and Form OF-306, Declaration of Appointee.  The Form SF-61 must be executed before any salary payments will be made (see 3 FAM 8914.4a).  The effective dates shown on Form SF-61, Form OF-306 and Form SF-50 should all be the same.  Noncitizens appointed as consular agents are not required to complete the Oath of Office (Part A of the Form SF-61). When not used, this part should be stricken.

b. Form PPT/FO 97, Passport Agent Signature Card, is available from CA/EX.

# 3 FAM 8913  APPOINTMENT OF TEMPORARY CONSULAR AGENTS

## 3 FAM 8913.1  Recommendation

*(TL:PER-404;  05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

a. Temporary consular agents are appointed in unusual circumstances:

   (1)  An emergency situation requiring the temporary services of a consular agent; or

   (2)  To provide for continuity of services during an extended absence of a consular agent.

A temporary consular agent may be appointed by the Department by the same procedure as outlined in 3 FAM 8912.1 through 8912.3.

b. In the event of an emergency in which there is insufficient time for submission

of the necessary appointment forms, and pending such submission, the supervisory post may make an electronic recommendation to the Department for appointment of the temporary consular agent. The recommendation includes information on any prior residence or employment in the United States of the person proposed for appointment and all other available basic investigative information. The appropriate regional bureau will initiate a Form SF-52 to appoint the temporary consular agent. The appropriate regional bureau, at its option, may require the supervisory post to draft and submit the Form SF-52 electronically.

## 3 FAM 8913.2  Approval and Provisional Recognition

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

a. Upon approval of the recommendation for temporary appointment, the Department notifies the supervisory post promptly and transmits the Form SF-50, Notification of Personnel Action, to the supervisory post.

b. The supervisory post, if other than a diplomatic mission, immediately informs the diplomatic mission in the host country of the appointment of a temporary consular agent in order that the mission may request provisional recognition.

c. A temporary consular agent does not receive an exequatur, and is not commissioned by the Department.

## 3 FAM 8913.3  Forms To Be Executed Upon Entry on Duty

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

Temporary consular agents complete the forms required under 3 FAM 8912.7 upon entry on duty.

## 3 FAM 8913.4  Effective Dates of Employment and Termination

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

Upon receipt by the post of the Department's approval of the temporary appointment and notice from the diplomatic mission that provisional recognition has been obtained, the appointee may assume duties as a temporary consular

agent. The official duty dates of employment and termination are the same as in
the case of consular agents, as set forth in 3 FAM 8912.6.

# 3 FAM 8913.5  Forms Required if a Temporary Consular Agent is Appointed as a Consular Agent

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

If in a rare circumstance the appointment of a temporary consular agent is later
converted to a full consular agent (see 3 FAM 8912.5), the post should ensure that
all forms required under 3 FAM 8912.7 have been executed and transmitted to the
Department

# 3 FAM 8914  CLASSIFICATION AND COMPENSATION

## 3 FAM 8914.1  Classification

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

All consular agent positions are classified at class 06 of the Foreign Service
Schedule.  The pay plan "FZ" is used for consular agents. On official personnel
documents, such as Form SF-52 and Form SF-50, class  06 will not be shown in
the grade/class blocks. Instead, the percentage, which represents the average
weekly workload, as calculated in 3 FAM 8914.3-1 below, will be shown.

## 3 FAM 8914.2  Salary Structure

*(TL:PER-405;   06-12-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

Taking into account local prevailing wage rates and the workload of the consular
agent, consular agents will be paid between 20 percent and 95 percent of one of
the 14 step rates of class 06 of the Foreign Service Schedule.  (See 3 FAM 8914.3-
1, paragraph B for a possible  exception to the 95 percent limitation.)

## 3 FAM 8914.3  Determining Individual Pay Rates

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*

U.S. Department of State Foreign Affairs Manual Volume 3
Personnel

*(State Only)*

A three-step procedure is used to set pay for individual consular agents.

## 3 FAM 8914.3-1  Step One: Determine Average Weekly Workload

*(CT:PER-678;   06-22-2012)*
*(Effective Date:  04-08-2001)*
*(State Only)*

a.  Workload percentage:

   (1)  First, the supervisory consular officer determines a percentage, which represents the consular agent's approximate average weekly workload. This percentage is calculated by determining the actual average number of hours worked per week in the past year and/or by estimating the number of hours expected to be worked per week in the coming year. The weekly average number of hours is further divided by 40 to determine the percentage of full-time work performed.  All percentage calculations should be expressed as a multiple of 5 percent. Amounts falling between a 5 percent interval should be increased to the  next higher increment of 5 percent (e.g., 46 percent should be increased to 50 percent)*;*

   (2)  In calculating the consular agent's approximate average weekly workload, the supervisory consular officer should take into account the hours to be worked by the agent, not solely the hours that the consular agency is open to the public.  However, activities of a primarily representational nature such as attending national day receptions and/or cocktail/dinner parties shall not be included when calculating the workload of a consular agent; and

   (3)  For example, if over the course of a year, taking into account seasonal variations, a consular agent works approximately 25 hours per week, 25 hours, divided by 40 hours, equals .625 (62.5 percent) or, rounded up, .65 percent. Thus, the result calculated for step one will be 65 or .65 percent.

b.  Workload limitations:

It is Department policy that no appointment will be approved for a consular agent to work for an average of less than 8 hours per week (i.e., 20 percent) or for more than 38 hours per week (i.e., 95 percent).  However, under extraordinary circumstances warranting a 40 hour average workweek, the supervisory post may request an exception.  If approved by CA/EX and the appropriate regional bureau, such approval will be noted in the remarks section of the Form SF-50.

## 3 FAM 8914.3-2  Step Two: Determine Step Rate

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*

**UNCLASSIFIED (U)**

U.S. Department of State Foreign Affairs Manual Volume 3
Personnel

*(State Only)*

a. The second step is to determine the appropriate step rate of class 06 of the Foreign Service Schedule.  Class 06, step 1, will be used for initial appointments.  However, a higher annual salary may be granted when the prevailing wage rates in the locality where the consular agency is located are such that a higher annual salary rate is necessary to properly recruit, retain or otherwise compensate the services of consular agents.

b. In such a case, the supervisory post should recommend and justify an appropriate higher step to the Department.  In consultation with the regional bureau and HR/RMA, CA/EX will advise the supervisory post of the appropriate step rate.  The post should note on the Form SF-50 that "step x is authorized on the basis of local prevailing wage rates."

c. The following also may be relevant in determining the appropriate step rate:

   (1) Fair Labor Standards Act Minimum Wage:  A higher annual salary must be granted when the average hourly rate paid to a consular agent who is a U.S. citizen would otherwise be less than the U.S. minimum hourly wage rate paid under the Fair Labor Standards Act as adjusted periodically; and

   (2) A highest previous rate (HPR) because of prior U.S. government service does not apply to consular agent appointments.

## 3 FAM 8914.3-3  Step Three: Calculate Per Annum Rate

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

a. A consular agent's final per annum pay rate is calculated by multiplying the percentage of the full-time work week times the appropriate step rate of class 06 (e.g., 65% of step 3 of class 06). This information must be recorded in the grade/level and step/rate blocks of the Form SF-50 (e.g., FZ-65-03).  The resulting per annum rate is entered in the salary block of the Form SF-50. Therefore, the supervisory post and regional bureau should pay particular attention to these sections when documenting the Form SF-52, Request for Personnel Action.

b. For payroll purposes, the per annum salary rate is divided by 2087 (i.e., the standard payroll divisor) and the consular agents are paid on a biweekly basis as if 80 hours of work were performed.  Note, however, that since the per annum salary rate has been adjusted by a percentage of the full-time workweek, the actual biweekly pay represents the average consular agent workweek and not a full-time workweek.

# 3 FAM 8914.3-4  Personnel Actions and Official Personnel Folder

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

a. When a consular agent's pay level is approved by CA/EX, the regional bureau, and HR/RMA, a Form SF-50 will be authorized to establish a consular agent's rate of pay.  The executive director's office of the appropriate regional bureau is responsible for preparing all personnel actions needed to carry out any pay or personnel changes unless automatically done as a systems change by HR/EX/SOD. The regional bureau, at its option, may require the supervisory post to draft and submit a Form SF-52 electronically.

b. An Official Personnel Folder (OPF) for each consular agent is established and maintained in the Records and Communications Staff (HR/EX/RR/RC).  All personnel information initiated at posts and by bureaus must be sent to HR/EX/RR/RC for insertion in the OPF.  If a consular agent has prior service, HR/EX/RR/RC will request documentation to verify and credit service.  The OPF is held for one year after termination of the appointment. If not reappointed within the year, the OPF is transferred to the National Personnel Records Center (NPRC) in St. Louis.

# 3 FAM 8914.3-5  Consular Agent Pay Adjustments

*(CT:PER-678;   06-22-2012)*
*(Effective Date:  04-08-2001)*
*(State Only)*

After the initial annual salary is established, consular agents may later receive pay adjustments as follows:

(1)  Individual pay adjustments:

   (a)  Consular agents may receive periodic pay adjustments through step 14.  CA/EX will approve such increases upon receipt of an annual performance appraisal (see 3 FAM 8917.2) that is "satisfactory" or higher. The minimum waiting period for a pay adjustment is 52 consecutive weeks in employment status up to step 10.  Thereafter, the minimum waiting period is 104 consecutive weeks;

   (b)  If the average workload changes for a significant period of time and is expected to continue to change or stabilize at a rate at least 10 percent above or below the currently authorized rate, the consular agent's average weekly workload percentage should be adjusted to reflect the changing work situation.  This is done when the current appointment expires or by converting the current appointment before it expires, thus creating a new appointment with a new rate of pay.

Supervisory posts should forward requests to adjust a consular agent's percentage to CA/EX, with a copy to the appropriate regional bureau for review and approval, if appropriate.  See 3 FAM 8915; and

(c)  When appropriate in rare circumstances after the initial appointment, the supervisory post may recommend to CA/EX and the appropriate regional bureau an adjustment in step level within class 06 of the Foreign Service Schedule in order to adjust for changes in the prevailing wage rates in the respective country of the consular agency. In consultation with the regional bureau, HR/RMA and HR/OE, CA/EX will determine whether a step level adjustment is warranted; and

(2)  Automatic pay schedule adjustments:  Consular agent pay rates are automatically adjusted at the same time and by the same percentage as other Foreign Service Schedule pay rates for class 06.  HR/EX/SOD will make these changes to the personnel system without further action from the post or regional bureaus.

## 3 FAM 8914.3-6  Obligation of Funds and Local Tax Obligations

*(TL:PER-405;  06-12-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

The salaries of both citizen and noncitizen consular agents are charged against allotments for the salaries of U.S. citizen employees. U.S. citizen agents and permanent resident alien agents (if any) are subject to Federal and state income tax withholdings as required by law.  Consular agents may have tax obligations under local law, and they are individually responsible for the payment of any taxes imposed by the government of the host country. (Also see 4 FAH-3 H-540)

## 3 FAM 8914.4  Effective Dates for Salary

*(TL:PER-404;  05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

a.  Salary is paid as of the official date the consular agent assumes duty, as established by 3 FAM 8912.6, or as otherwise determined by the principal officer of the supervisory post under the provisions of 3 FAM 8915, provided that no salary is paid until the Form SF-61 has been executed. (See 3 FAM 8914.7 regarding acting or temporary consular agents.)  On initial appointments or conversions, this date and the effective date shown on the Form SF-50 should be the same.  (See 3 FAM 8912.7.)

b.  Consular agents' salaries shall be adjusted automatically by statutory adjustments authorized for class 06 of the Foreign Service salary schedule.

c.  Salary terminates on one of the following dates, as appropriate:

(1)  In event of death in service, on the date of death;

(2)  In event of separation, on the last day of active duty, as stated in the appropriate Form SF-50, Notification of Personnel Action;

(3)  In event of absence from duty, without immediate replacement by an acting consular agent, on the last day of duty prior to the period of absence, unless otherwise determined by the principal officer of the supervisory post under 3 FAM 8915;

(4)  In event of relinquishment of duties to another consular agent or acting consular agent, on the date of such relinquishment; or

(5)  Upon expiration of a temporary or limited Foreign Service appointment that is not extended.

## 3 FAM 8914.5  Social Security Coverage

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

a.  U.S. citizen and U.S. permanent resident alien consular agents are subject to FICA tax deductions and earn eligibility for Social Security Retirement, Survivors, Disability and Health Insurance (RSDHI) benefits. Noncitizen agents who are not U.S. permanent resident aliens are not eligible for such benefits. (See 3 FAM 6100, Appendix B, Old 3 FAM 679.)

b.  The Vienna Convention on Consular Relations does not exempt consular agents from the social security provisions in force in the host country.  Therefore, consular agents may be required to participate in the host country social security system.

## 3 FAM 8914.6  Limitations on Compensation and Benefits

*(TL:PER-405;   06-12-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

Due to the nature of their temporary or limited appointments, intermittent work schedules, recruitment at posts abroad, authorization of pay based on local prevailing rates, etc., consular agents are usually exempt from additional Federal compensation and benefits programs. The following summarizes entitlements to benefits:

(1)  Annuitants—If a retired U.S. Government employee is appointed as a consular agent, he or she becomes a reemployed annuitant and is subject to the requirements of the retirement system from which retired and to all laws relating to dual compensation or other similar prohibitions;

(2) Health Insurance—Consular agents are not eligible to participate in the Federal Employee Health Benefits Program (FEHBP) due to their intermittent work status except for a former Federal employee who was covered by the health insurance program and then hired as a consular agent without a break in Federal service of more than three calendar days. However, the Department (CA/EX) will reimburse consular agents a percentage of premiums of health insurance up to a maximum specified amount. The percentage set for calendar year 2001 is 70 percent with the maximum amount set at $2,000 for a self-only policy and at $5,000 for a family policy. These amounts will be adjusted each calendar year for inflation. Consular agents should present to the supervisory post's financial management office a paid receipt indicating the amount paid for a full-year policy together with a copy of the policy;

(3) Allowances—Consular agents are not eligible to receive allowances and post differentials authorized by the Standardized Regulations, per 3 FAM 3211.2-2;

(4) Incentive Awards—Consular agents are covered by the Incentive Awards Program described in 3 FAM 4800. Supervisory posts should follow the guidance and procedures outlined in that regulation;

(5) Leave—Consular agents do not accrue and are not charged annual leave, sick leave, etc. because they are neither full-time employees nor part-time employees with an established regular tour of duty. [See 3 FAM 3300 and 5 U.S.C. 6301];

(6) Life Insurance—Consular agents are not eligible to participate in the Federal Employees Group Life Insurance Program (FEGLI) due to their intermittent work status except for a former Federal employee who was covered by the life insurance program and then hired as a consular agent with a break in Federal service of less than three days and who is expected to return to the former position. See 5 CFR 870.302(b)(3);

(7) Premium pay—Consular agents are not covered by either the premium pay (e.g., overtime, compensatory time off, night pay, Sunday pay, holiday pay) benefits of Title 5, U.S.C., nor by the overtime provisions of the Fair Labor Standards Act (see 3 FAM 3130);

(8) Retirement—Consular agents are not eligible to contribute to or earn credit toward the Foreign Service Retirement and Disability System, the Foreign Service Pension System, the Civil Service Retirement and Disability System 89, or the Federal Employees Retirement System, or to participate in the Thrift Savings Plan (TSP) except those who are U.S. citizens whose appointments as consular agents are made without a break in continuity of service of more than three days from positions in which they were covered by the Civil Service Retirement and Disability System or the Federal Employees Retirement System. See 22 U.S.C. 4043, 22 U.S.C. 4071b and 5 CFR 891.201(a)(2);

(9) Work Injuries—Consular agents are covered by the Federal Employees' Compensation Act (FECA) for compensation for injuries sustained in the performance of duty, including disability and death benefits. This program is administered by the Office of Workers' Compensation Programs (OWCP), Employment Standards Administration, U.S. Department of Labor. In the event of a work injury, the consular agent should immediately contact the supervisory post which, in turn, should immediately contact the appropriate regional bureau executive director (see 3 FAM 3630 and 3 FAH-1 H-3630, and 5 U.S.C. 8101, et. seq.); and

(10) Death Gratuity—Survivors of consular agents who die as a result of injuries sustained in the performance of duty outside the United States are eligible for payment of a death gratuity, in accordance with the provisions of 3 FAM 3650 and 3 FAH-1 H-3650.

# 3 FAM 8914.7  Compensation for Acting and Temporary Consular Agents

*(TL:PER-405;   06-12-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

An appointed acting consular agent awaiting full consular agent status or an appointed temporary consular agent receives compensation at the annual rate under the same rules that govern the payment of consular agents. Compensation for acting and temporary consular agents begins and terminates in accordance with the dates of official duty and termination under the provisions of 3 FAM 8912.6.

# 3 FAM 8915  HOURS OF WORK AND ABSENCE FROM DUTY

*(TL:PER-405;   06-12-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

a. Consular agent positions are not intended to be full-time permanent positions and the salary schedule established by the Department clearly contemplates intermittent work schedules with seasonal variations that average less than full-time work performance.  It is Department policy that no appointment will be approved for a consular agent to work for an average of less than 8 hours per week (i.e., 20 percent) or for more than 38 hours per work (i.e., 95 percent). However, under extraordinary circumstances warranting a 40-hour average workweek, the supervisory post may request an exception.  If approved by CA/EX and the appropriate regional bureau, such approval will be noted in the remarks section of the SF-50.

**UNCLASSIFIED (U)**

U.S. Department of State Foreign Affairs Manual Volume 3

Personnel

b. Any claims by consular agents that an average work week of more than 30 hours (i.e., 75 percent category) is required on a continuous basis must be continuously documented and carefully justified by the supervisory consular officer. In addition, supervisory posts must evaluate the need for a consular agent with an average workweek of more than 30 hours at least six months prior to the expiration of the consular agent's appointment.  Such evaluation should include a summary of the actual work hours worked by the respective consular agent over the previous appointment period.  The evaluation should be forwarded to CA/EX (with a copy to the regional executive office) for review and approval before renewal of an appointment.  Activities of a primarily representational nature such as attending national day receptions and/or cocktail/dinner parties shall not be included when calculating the workload of an agent.

c. As intermittent employees, consular agents are not required to adhere to regularly scheduled office hours or a fixed schedule of days or hours of duty. The nature of their work requires attention at irregular times beyond the control of the Department and the individual consular agent.  Thus, consular agents' salaries are fixed on a per annum basis.

d. Nothing in these regulations shall be interpreted as limiting the number of hours, which may be spent by a consular agent in providing urgently required protection for the rights and welfare of U.S. citizens in distress or precluding assistance in an emergency.  No separate additional compensation beyond the per annum salary (such as allowances, night-pay differentials, overtime, Sunday, or holiday pay) is paid to consular agents.

e. Significant absences from the agency must be reported (in advance, if possible) by the consular agent to the supervisory post.

f. If the consular agent is absent for a significant period of time (and whether or not a temporary consular agent is available and appointed by the Department to provide continuity of service), the regular consular agent's salary must be discontinued during the prolonged absence. In the discretion of the principal officer at the supervisory post, the consular agent's salary may be withheld for a part or for all of the period of such absence.

g. The supervisory post must notify the appropriate regional bureau and CA/EX of the consular agent's absence in a non-pay status; report the number of days absent for purposes of discontinuing salary; and report the agent's return to duty. The appropriate regional bureau shall initiate a Form SF-52 to discontinue pay and later will also initiate a second Form SF-52 to adjust the consular agent's service computation date (SCD) to reflect the period of absence.

# 3 FAM 8916  TRAINING

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*

**UNCLASSIFIED (U)**

*(State Only)*

a. Newly hired consular agents are required to take the citizens services and passport and nationality portions of the basic consular course at the Foreign Service Institute within six months of receiving their temporary appointment. The supervisory post is responsible for enrolling the consular agent at FSI, with funding provided by the regional bureau. The supervisory post is also responsible for providing newly hired consular agents with the regulations and instructions required for the consular agent to perform his or her duties.

b. In addition, supervisory posts should ensure that newly hired consular agents receive an ethics orientation. See 3 FAM 8912.2(4).

# 3 FAM 8917  PERFORMANCE EVALUATION

## 3 FAM 8917.1  Annual Assessments

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

While more frequent visits may be appropriate and can be undertaken by other consular officers, supervisory consular officers should personally assess the operation of each consular agency under their jurisdiction at least annually. Assessments should focus on such areas as workload percentage, effectiveness of support staff (if applicable), internal controls, and appropriateness and condition of agency office space and equipment. Copies of trip reports should be sent to both CA/EX and the appropriate regional bureau.

## 3 FAM 8917.2  Written Performance Evaluations

*(TL:PER-405;   06-12-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

Supervisory consular officers must prepare an annual performance evaluation report on each consular agent under their jurisdiction. In evaluating the performance of a consular agent, supervisory posts will consult the Consular Agents Guidebook for specific performance criteria and additional guidance established by the Bureau of Consular Affairs. The due date shall be June 30. Timeliness is important to ensure that consular agents promptly receive any periodic pay adjustments for which they may be eligible (see 3 FAM 8914.3-5, paragraphs a and b). Form JF-57 should be used for consular agent annual appraisals and should be submitted to CA/EX, with a copy to the appropriate regional bureau.

**UNCLASSIFIED (U)**
U.S. Department of State Foreign Affairs Manual Volume 3
Personnel

# 3 FAM 8918  SEPARATION OF CONSULAR AGENTS

## 3 FAM 8918.1  Resignation and Termination

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

The supervisory post should report the resignation or termination of an appointment of a consular agent, acting consular agent or temporary consular agent to the Department (CA/EX and regional bureau). The appropriate regional bureau will initiate Form SF-52, Request for Personnel Action, to separate the employee.

## 3 FAM 8918.2  Termination of Appointment

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

Section 613 of the Act (22 U.S.C. 4012) provides that the "Secretary of State may terminate at any time the appointment of any consular agent in light of the criteria and procedures normally followed in the locality in similar circumstances." This provision refers to unexpected termination of an existing limited appointment and does not refer to the following conditions:

(1)  The termination of a limited appointment on the expiration date that was specified as a basic condition of employment on Form SF-50 at the time the appointment was made;

(2)  Termination of salary payment based on conditions specified in 3 FAM 8915 for significant absences;

(3)  Voluntary separation of the consular agent;

(4)  An adjustment in salary due to a significant change in workload under 3 FAM 8914.3-5 paragraph a; and

(5)  Separation for cause.

## 3 FAM 8918.3  Separation for Cause

*(TL:PER-404;   05-25-2001)*
*(Effective Date:  04-08-2001)*
*(State Only)*

a.  The supervisory post may recommend to the Department the separation of a consular agent, acting consular agent or temporary consular agent in a case of less than fully satisfactory performance of duties, misconduct, or malfeasance.

**UNCLASSIFIED (U)**

U.S. Department of State Foreign Affairs Manual Volume 3

Personnel

b. The principal officer of the supervisory post may suspend the agent from further performance of the agent's duties and notify the Department (CA/EX and the appropriate regional bureau) by cable, giving complete details.  The Department makes the final decision and notifies the principal officer of the supervisory post, who in turn informs the agent of dismissal or restoration to duty, as the case may be.

# 3 FAM 8919  UNASSIGNED